Good morning, Your Honor. Doug Beavers on behalf of Ricardo Fraire. Mr. Beavers, I wonder if you'd speak more directly into the microphone. The acoustics in this room are crummy. Thank you, Your Honor. I'd ask for three minutes for rebuttal. Keep track of your time. Thank you, Your Honor. May it please the Court. The main issue in this case is whether checkpoint stops are truly going to remain exceptional. The usual standard of reasonable suspicion, the Supreme Court has set out a few exceptions, and the question is, are those going to remain unusual and exceptional? The party's main difference is whether empirical data is needed to support some type of exception to reasonable suspicion. In the government's brief, they've argued that empirical data is completely unnecessary, and they had none. In their brief at page 10, they describe the standard. We don't disagree on the standard for when a checkpoint would be reasonable, that the Court has to consider the gravity of the public concern, the public interest advanced, and the severity of the interference. But the problem is, our difference is, how do you define that? How severe does the problem have to be? And the government is essentially arguing for a purely subjective standard, just what I would submit any particular panel would feel was serious. And there is, in Illinois v. Litzer, the Supreme Court did not rely on empirical evidence that talking to witnesses is helpful in a crime. They didn't have any studies. They didn't have any data to back that up. But they did have basically an uncontested position. The Supreme Court did state that that was uncontested, and I think that is sort of obvious. And I think there is some category of severity where a circumstance is so severe that the government wouldn't need to put on any evidence. But whether hunting in a national park is that type of severity and rises to the level of gravity where the ordinary reasonable suspicion standard wouldn't apply, I submit is just a completely unworkable formula. There is, that would allow checkpoints for virtually everything. Counsel, under the Supreme Court's case law, whose burden is it to satisfy the problems that Edmonds showed? Our position is that since it's a warrantless stop, the government would have the burden of proving by a preponderance that the checkpoint is reasonable. And to the extent that empirical evidence is needed, I would submit the government has the burden on that issue. Is there anything in the record to show that the purpose of the stop was other than general police-type enforcement? I don't see anything in the record to show that it was for, say, education or anything. They argued that, but the officer told the truth and said it's obvious, it's well known. Didn't the district court find that? Excuse me? Page 8 of the district court's order. In addition, checkpoint purposes included deterrence, education and, in turn, wildlife protection. The court did state that, but I don't see that that's supported in the record in any way that would be substantial, other than the mere fact that criminal enforcement is always educational and public. Well, is this really general criminal enforcement? You're talking about a national park and you're talking about something aimed not at drug smuggling, not at generic crimes, but at poaching, at protection of wildlife. How is that general law enforcement? Just in the sense that poaching is just a general crime. It's not one of the unusual and intractable. You don't see any unique link between national parks and protection of wildlife? That's one of their purposes, but that's not any particular difference than any of the other crimes that they enforce up there, protection of the plants and everything. Well, I agree, but it's not looking for generic crime. They're not looking for robbers. They're not looking for drug smugglers. They're not looking for murderers. If they find one, fine. If they find a DUI, fine. But if the checkpoint is set up specifically for something uniquely linked to the purpose of the national park, then can that fairly be called general law enforcement, or is it something special? I mean, I have to admit, it seems pretty obvious to me there's a direct connection between national park and protection of wildlife. I agree, but I do think that it is special. But the problem is every law enforcement agency has something special. I don't think so. What's special about the San Francisco Police Department? If they threw up something on Market Street or if the Indianapolis Police Department threw something up on Meridian Avenue, okay. But this is the national park, and this is something specifically aimed at protection of wildlife. I mean, if you don't see a difference there, I have difficulty understanding what this case is supposed to be about. Well, Your Honor, the difference is that the San Francisco police could easily be organized to have a task force for some specific purpose. The national park, it's just to protect wildlife and the whole environment there, but one of the methods is to enforce many different rules, including preventing theft of plants and to prevent crimes there, allow people to sightsee cameras. The whole range of crimes would be included in that potentially. This just picked one crime, but I don't see how it could be. Could they stop somebody coming into the park to give them a map? There was no evidence. No, I'm asking you, hypothetically, could they stop people coming into the park to say, welcome to the park, here's a map? Sure. Could they stop them to say, welcome to the park, don't burn anything, we're having a high burn day, don't start any fires in the park? Yes, and there is the problem that they could lie to avoid this, but they didn't here. They told the truth. Yeah, well, if they can stop you to give you a map and they can stop you to say don't start a fire, why can't they stop you to say don't hunt? Well, the same reason that they can stop you to question for witnesses, they can stop, police can stop for traffic control, but they can't stop to look for drugs. These are subjective. There is a subjective aspect to the checkpoints. I see you're down to three minutes and you said you wanted to reserve. Thank you, Mr. Biewald. Good morning. Good morning, Your Honor. May it please the Court, Mark McKeon for the United States. I'd like to respond to a couple of the questions that the Court raised with my colleague. First of all, in terms of the record, on page 27 and 28 of the clerk's record, the officer's testimony is transcribed, and he says the purpose of the checkpoint was safety concern for the public because if they allowed hunting in the park it would be a danger. He also mentions educating everybody is a purpose. And then finally, later in his testimony on page 36, he states the educational purpose of the checkpoint is we definitely educated a number of people because of the checkpoint. Do we know whether they stop people going in, coming out, or both? Both, Your Honor. What's the educational purpose of stopping people on the way out? Well, people come and go from the national parks, and I think what they want to do, speculating, getting into their mind, is they want people to know that hunting is not allowed in the parks and for the public to be aware of those restrictions. In this particular case, the area, according to the record, where the checkpoint took place was the big stump area where people actually have to stop anyway. They come into the park. They have to pay. It's a pull-off on the side of the road. They have to pay and pay their admission fee. They're given a map. They're given a brochure, and it's off the side of the road, so you can't tell if a car is coming through, if it's been in the park, or if it's coming into the park. In this case, I think the defendant stated that he had been at the Grant Grove area, which is just down the road, so it appears that he had been in the park. In addition, in this particular place, Kings Canyon National Park is a very small area. You come into the park. You pay your fee. You're pulled off, and if you go a mile in either direction, you're in National Forest. You're outside of the park, or if you go a mile coming in in either direction, you pop into this little part of the park. You actually have to drive through the National Forest to get to Sequoia Kings Canyon or to get to the rest of Kings Canyon, and in those cases, there's no further checkpoints. That's all very interesting, but ultimately we get to what Edmonds inquires, and that is, what is the primary purpose of this stop? Isn't that correct? That's what Edmonds said, and I think that You think they were kidding? No, I don't think they're kidding, Your Honor, but I think that if you look at if you apply Edmonds the way counsel wants you to apply it, then none of the other stops, everything has a law enforcement purpose, catching drunk drivers, catching unlicensed drivers. Well, but the Supreme Court has very carefully carved out some exceptions based upon immediacy, based upon a unique situation like enforcement at the border, but in this case, on ER 27, counsel asked the purpose of the wildlife checkpoint. Well, you say that it has a very specific purpose, and your agent said, the ranger said, yes, to curb, to enforce wildlife hunting laws within the park. Yes. Isn't that the primary purpose of this stop? I would say that, yes, Your Honor, but I don't think to curb and enforce means necessarily to catch poachers. It means to deter and to educate as well. But that's kind of a canard, isn't it? I mean, that's a secondary purpose, and it's very clear under Edmonds that secondary purposes don't control here. Realistically speaking, if you can do this on a generalized basis, where can't you set that up? Why can't you, on the outside of an exclusive project or a gated community, just set up a police stop on the basis you're going to educate people? But what you're really looking for is drugs or teenagers coming back from parties that are high or something like that. Why can't they do that under the standard you're proposing? Well, I would say three things in response to that, Your Honor. First of all, I wouldn't concede that it's only a secondary purpose. Well, that's what the agent said. That's what the ranger said. He said his purpose was to curb and enforce, and I think that includes educating. That includes deterrence. I don't think that pushes those into secondary purposes. Secondly, this is not an innovative, new, fangled use of traffic stops. This is something that has been approved in multiple states. It's been approved in other district courts. Do you have any evidence that this has ever been approved in the Ninth Circuit or any district court within the Ninth Circuit? Not in the Ninth Circuit, Your Honor, but we do have dicta from the Supreme Court that ---- Do you have any cases with holdings? Not from the Ninth Circuit, Your Honor. How about the Supreme Court? Do you have anything from the Supreme Court that says that what you've done here is lawful? Yes, Your Honor. Well, what is that? Speak into the microphone. Would you please? You're wandering from the mic. I'm sorry. Hopefully my argument isn't wandering as well. In Delaware v. Prowse, this is the case that counsel relies upon to state that there needs to be an empirical test. In that case, the court did two important things. Well, the court did, and then, in a concurring opinion, the justices did something important. First of all, they indicated that even in that case, the problem was that there were less intrusive ways of doing this other than random stops, and they approved or suggested that questioning of all oncoming traffic at roadblock-type stops is a possible alternative, which is what we did here. But secondly, in Justice Blackmun's concurrence, joined in by Justice Powell, he says, quote, I would not regard the present case, Delaware v. Prowse, as a precedent that throws any constitutional shadow upon the necessarily individualized and perhaps random examination by game wardens in the performance of their duties. Here we don't even have the randomness that he tacitly approved in his concurrence. We have a set checkpoint. And then I would also note that in Edmunds, they didn't back away from this, this exception. In that case, they said on page 47 of their opinion, it goes without saying that our holding today does nothing to alter the constitutional status of the type of traffic checkpoint we suggested would be lawful in Prowse, which is a checkpoint to check for, in that case, driver's licenses and registrations. They suggested that would be okay. In this case, we do have a unique situation. We have a national park. We have people who are on trails, people who are in the woods who are not expecting to find hunters. And in that case, if it is acceptable in Delaware v. Prowse to check all cars for licenses or registrations to get unlicensed drivers off the road, this is even, I would suggest, a more serious case to get hunters out of the woods to make sure that they're not, you know, it's not a question of catching them. It's a question of making sure that they're not firing their guns where people are in the woods in the national parks to begin with. That's another reason why I think that you can't look at this empirical test, because the test that counsel suggested suggests would have you looking backwards, would have you look at the end of the day and see whether there were any arrests, and then base that on determining whether or not the checkpoint was lawful. But you can't wait until the end of the checkpoint to determine if it's lawful or not. Secondly, the fact that the ranger could not recall any arrests merely emphasizes our point that the purpose of this was not necessarily to catch poachers. If they did, that was fine, but it was to keep people from doing this to begin with, to let the public know that they were enforcing the law and that they were taking seriously the ban on hunting in Kings Canyon and Sequoia Park. But that gets back to the primary purpose, though. They were trying to prevent poaching, right? Yes, prevent poaching. Okay. So that's a criminal activity, and they were trying to prevent it. If they're trying to prevent it, is that the same as trying to detect it after it's happened? I don't believe it is, Your Honor. And I think that, yes, poaching is a criminal activity. So is driving under the influence. So is transporting illegal aliens. So is driving a car without a license and registration on the road. So is boarding a plane with a gun. I mean, the idea is not necessarily to catch people. It's to prevent the plane from being hijacked. That's true, Your Honor. I mean, we approve checkpoints coming into buildings like this one. People are stopped and questioned for the safety of the people that are in the buildings here. The ranger said that this was for the safety. I would submit, Your Honor, that this case is not unusual. It's a case that is only unusual because it hasn't come up before in this court, but it has been approved by many state courts. It's been tacitly approved by at least two justices of the Supreme Court. And this case is really more like and very much like the cases which have already approved checkpoints, and it is the Edmonds case, which was a drug enforcement operation. Thank you. Thank you. Mr. Beavers, you've got about three minutes left. Thank you, Your Honor. First, to respond to the situation regarding checkpoints and airplanes and courthouses, those are consent-type searches, very different. I'm not aware of anything where anyone has challenged that on the ground that that was they didn't give consent. What consent are you referring to? Going onto a plane, you go through past big signs, same going to the building. You consent to the search when you see the metal detector. Well, how is that any different than driving up to the park and seeing them and you decide to go into the park? Because this is a public way that's more that's open to the public. It's not like in a building where there's restricted access, and those are much different. This is a place where, in the park, firearms are allowed. You're allowed to go through with guns, and the only question is whether or not they can enforce the restrictions on poaching. If you're right, I suppose the logical result would be that libraries, for example, wouldn't be able to look in people's book bags when they leave the library to see if they're stealing books. Would that be right? Would that be a logical follow-up from your? I would think if you got consent in advance, I think you could do things like that. Who consents when you go to the library to have your book bag? They don't because it's not customary. If it were, there are certain libraries. Every public library I go, they make you show your bag when you leave. I'm thinking of rare book collections, things like that. You get my point. It's not getting to the arcane or the rare books. You get the general idea that if you leave in the library, they have the right to look in your bag. I think in an ordinary circumstance, you might be able to. I haven't really briefed that issue, but I think it has to go with how big the risk is, how much of a problem it would be, and what a person consents, whether there's warnings. In this circumstance, this is a checkpoint stopping a person who is on a public way going along their way. I think that's different than entering property owned by somebody else. I think the other issue, whether the dicta in Delaware versus Prowse on wildlife checkpoints, I think that's very different. And some of the State cases are very different because those are places where hunting is allowed, and they're basically trying to make sure people pay their little fee. They're not trying to catch poachers. They're trying to have someone checking so that people go and pay 20 bucks to get their license. But it's still law enforcement, though, isn't it? It is, but it's less criminal. It's more like the immigration checkpoint than the drug checkpoint. Thank you. Thank you. Mr. Kuehn, thank you as well. The case just argued is submitted. Good morning. Thank you.
judges: Silverman, Clifton, Smith M.